UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ADAM GORDY,<br><br>   Plaintiff,<br><br>   v.<br><br>AGAMYAN et al.,<br><br>   Defendants. | Case No. CV 18-2590-GW (JPR)<br><br>ORDER DISMISSING COMPLAINT WITH LEAVE TO AMEND AND DENYING REQUEST FOR APPOINTMENT OF COUNSEL |

On March 30, 2018, Plaintiff, an inmate at California State Prison-Los Angeles County, in Lancaster, filed pro se a civil-rights action under 42 U.S.C. § 1983 and requested appointment of counsel. He was subsequently granted leave to proceed in forma pauperis. His claims arise from allegedly inadequate medical care he received at CSP-LAC following a 2017 mental-health crisis.

After screening the Complaint under 28 U.S.C. §§ 1915(e)(2) and 1915A, the Court finds that its allegations largely fail to state a claim upon which relief might be granted. Because it appears that at least some of the defects can be cured by

1

amendment, the Complaint is dismissed with leave to amend. See Lopez v. Smith, 203 F.3d 1122, 1130-31 (9th Cir. 2000) (en banc) (holding that pro se litigant must be given leave to amend complaint unless absolutely clear that deficiencies cannot be cured). If Plaintiff desires to pursue any of his claims, he is ORDERED to file a first amended complaint within 28 days of the date of this order, remedying the deficiencies discussed below.

**ALLEGATIONS OF THE COMPLAINT**

Plaintiff has been incarcerated for robbery since 2009. (Compl., Ex. B at 8.)[1] He has a "severe history of mental illness" (id., Ex. E at 14) and has been diagnosed with schizoaffective disorder and a mood disorder (id., Ex. B at 8, 66). On February 21, 2012, he was admitted to the Mental Health Crisis Bed unit at his prison, apparently for overdosing on "pills and heroin." (Id. at 8, 20-21.) He apparently received a suicide-risk evaluation by prison staff sometime in 2014, for unknown reasons.[2] (Id.) On February 4, 2017, nondefendant doctor "K. Rastegari" prescribed him buspirone, mirtazapine, and perphenazine, which he was still taking at the time of the events that gave rise to his claims. (Id. at 66, 84-86.) Until February 13, 2017, Plaintiff received mental-health services at

---

[1] The Court uses the pagination generated by its Case Management/Electronic Case Filing system to refer to portions of Plaintiff's filings that are not consecutively paginated or contained in numbered paragraphs.

[2] The results of that evaluation are not included in the Complaint or its attached exhibits.

the EOP level of care.³ (Id. at 8, 20-21.) As of March 31, 2017, he was receiving services at the CCCMS level of care.⁴ (Id., Ex. E at 14.)

On March 31, 2017, Plaintiff sought "mental health staff help for his suicidal ideations." (Compl. ¶ 6.) He was placed on suicide watch in a holding cell at "C. Clinic." (Id., Ex. B at 2.) The following morning, he was evaluated by Defendant "Granlund Psy.D." (Compl. ¶ 3 & Ex. B at 6-8.) He told Granlund that he was "depressed" and "not doing good," he had received "bad news," his mother had "had surgery," and he "hadn't been seen by anybody." (Id., Ex. B at 6, 8.) Granlund reported that she "attempted to obtain more details" about Plaintiff's symptoms and family situation but was unable to do so. (Id. at 8.) Plaintiff "notified Granlund that he still felt suicidal" and said that "if released from suicide watch he would slice his wrist." (Compl. ¶ 7.) Granlund reported that Plaintiff had four of 10 "imminent warning signs" of suicide but "denied plans, mean[s,] and intent to kill himself when asked about a specific plan." (Id., Ex. B at 7-8.)

---

³ EOP stands for "Enhanced Outpatient Program," which is for inmates who are "unable to function in the general prison population" because of "acute onset or significant decompensation of a serious mental disorder." See Coleman v. Brown, 28 F. Supp. 3d 1068, 1075 (E.D. Cal. 2014).

⁴ The Correctional Clinical Case Management System "is the lowest level of outpatient mental health care" in the California state prison system, meant for inmates who "exhibit[] stable functioning," do not need "higher levels of care," and show "symptom control" or "partial remission due to treatment." Haughton v. Sherman, No. EDCV 16-251-DOC (GJS), 2016 WL 7167905, at *7 n.4 (C.D. Cal. Oct. 19, 2016), accepted by 2016 WL 7167924 (C.D. Cal. Dec. 7, 2016).

Granlund consulted with nondefendant "Dr. Topchyan," a supervising psychologist, and the two agreed that Plaintiff's condition "[did] not warrant" admission to the MHCB. (Id. at 8.) Granlund observed that Plaintiff had been "placed up for transfer to SVSP or COR"[5] on March 25, 2017, and speculated that "[he] may be attempting to avoid transfer as his family lives in the Los Angeles area." (Id.) Plaintiff alleges that he "was not malingerant [sic] he truly was suicidal." (Compl. at 20.) He was not present when the transfer decision was made because he had a "Board Consultation Hearing" around the same time, and he did not learn of the prospective transfer until sometime after Granlund's evaluation. (Id., Ex. E at 11.)[6] At around 11:15 a.m. on April 1, 2017, shortly after the meeting with Granlund, Plaintiff was discharged from suicide watch and returned to his cell. (Id., Ex. B at 2; see also Compl. ¶¶ 7-8.)

At "approximately 11:30 a.m." that same day, Plaintiff's cellmate "found . . . Plaintiff bleeding from his wrist." (Compl. ¶ 8.) Plaintiff was "escorted to Facility 'D' Medical." (Id.) Nondefendant "R.N. Amos" completed a CDCR "Medical Report of Injury or Unusual Occurrence" at around 12:30 p.m., noting that Plaintiff had an "abrasion/scratch" on his left wrist and had stated "Imma kill myself." (Id. ¶ 9 & Ex. A.) Amos allegedly "notified Granlund that . . . Plaintiff was bleeding

---

[5] These are apparently prisons in other parts of the state. Salinas Valley State Prison is in Monterey County and Corcoran State Prison is in Kings County.

[6] Plaintiff's filings do not disclose when he learned he might be transferred.

4

from his wrist" and was still "suicidal." (Compl. ¶ 9.)[7] Granlund told Amos that "she had released" him earlier and "again sent him home after he made attempts to cut his wrist." (Id. ¶ 10.) Plaintiff was returned to his cell. (See id., Ex. A.)

On April 2, 2017, at around 10:55 a.m., Plaintiff was evaluated by nondefendant "B. Ivra Ph.D" in connection with an "ordered . . . five (5) day stepdown." (Compl. ¶ 12 & Ex. B at 1, 9-10.) Ivra reported Plaintiff's stating that he was suicidal, with plans to cut and hang himself. (Id., Ex. B at 9, 13.)[8] Ivra referred him to MHCB. (Id. at 1, 9.) "Right after the interview" with Ivra, "the doctor" ordered Plaintiff to be held in "'B'-section shower" to "keep him safe from his suicidal tendencies [that] he [had] just expressed." (Compl. ¶ 13.)

Defendant "Agamyan Ph.D" arrived shortly thereafter and "evaluated Plaintiff." (Id. ¶¶ 3, 14 & Ex. B at 20-21.) Plaintiff "expressed" to Agamyan that he was still suicidal and that "if he was returned to his cell he would cut his wrist" again. (Compl. ¶ 14.) Agamyan "told Plaintiff that she would only order" MHCB placement "if he actually hurt[] himself." (Id.) Agamyan completed a CDCR "Suicide Risk Evaluation" form acknowledging that Plaintiff said he was suicidal and hearing voices and claimed to have made "8 to 10" previous suicide attempts; noted he had overdosed on "pills and heroin" twice in

---

[7] In fact, Amos's report does not indicate that Plaintiff was bleeding. (See Compl., Ex. A.)

[8] Ivra nevertheless checked boxes on the follow-up form indicating that Plaintiff had "not at all" had thoughts of suicide and was "not at all" likely to harm himself in the next week. (See Compl., Ex. B at 9, 12.)

5

2012, while in CDCR custody; and opined that he had four of 10 "imminent warning signs" of suicide. (Id., Ex. B at 20-21.) The report nevertheless concluded that Plaintiff "has no desire to die and has no clear plan or intent," and his "anger and insistence" on MHCB placement was an attempt "to avoid transfer [to another prison] as his family lives in the Los Angeles area." (Id. at 21.) Plaintiff alleges he was truly suicidal and not malingering. (Compl. at 20.) Agamyan "purposely manipulated the [medical] documentation" in an effort to "imply that . . . Plaintiff [was] malingering." (Id. at 24-25.) He was returned to his cell around 11:55 a.m. (Id. ¶¶ 14-15 & Ex. B at 21.)

Plaintiff "immediately" "sliced his wrists [and] stomach" and "ingested a razor blade in the attempt to end his life." (Compl. ¶¶ 15, 21.) Unnamed "custody" staff "discovered that [he] was bleeding" and took him to the "C/D medical" facility and later to the treatment triage area. (Id. ¶ 15.) That afternoon, Plaintiff told nondefendant nurse "K. Hammer" that "he wanted to kill himself so he swallowed a razor blade and cut himself." (Id., Ex. B at 72.) Hammer observed that he had "many small lacerations (self-inflicted)" on his abdomen, wrists, and forearms and was reporting "acute pain" from "razor blade ingestion." (Id. at 71.) She also noted that he was "calm[,] smiling[,] and joking with staff," without visible discomfort or distress. (Id.) Hammer consulted with nondefendant doctor "C. Wu" by phone, and an x-ray was scheduled for the following day. (Id. at 67, 70-71.) Plaintiff indicated to Hammer that he agreed with the treatment plan. (Id. at 71.) Agamyan reevaluated him while he was in the triage area and placed him back on suicide

6

watch. (Id. at 19.)

Later that evening, Plaintiff sounded an alarm, complaining that he had been throwing up blood and was suffering from stomach pain. (Id. at 73-74.) He was returned to triage. (Id.) An unnamed correctional officer told nondefendant nurse "Flora" that Plaintiff had admitted "he was doing all these [self-harming behaviors] because he doesn't want to be transferred." (Id. at 74.) Flora observed "no acute distress" from Plaintiff but notified Wu anyway. (Id.) Wu came to triage and assessed Plaintiff in person but did not send him to the hospital. (Id. at 75.) Medical staff "ignored" Plaintiff's pain "until the next day." (Compl. ¶ 16.)

On April 3, 2017, Plaintiff was given an x-ray, which showed a "razor blade . . . projected over the stomach." (Id. ¶ 17 & Ex. B at 89.) He was "taken in a[n] ambulance to Palmdale Regional Hospital," where he was "given ample exams in a myriad of test[s]" over the next four days. (Compl. ¶ 17; see also generally id., Ex. D.) On April 8, 2017, Plaintiff "was admitted to the Mental Health Crisis Bed (MHCB) in Chino prison." (Compl. ¶ 18.)

Plaintiff brings claims for deliberate indifference to serious medical needs under the Eighth Amendment (id. at 18) and violations of the Americans with Disabilities Act, 42 U.S.C. §§ 12101 et seq., and § 504 of the Rehabilitation Act, 29 U.S.C. § 794 (id. at 25).[9] He sues Agamyan, Granlund, and John Does One

---

[9] The Complaint's introductory paragraph asserts violations of the First and 14th amendments and what appears to be a state-law claim for negligence or medical malpractice (see Compl. at 8), but

7

through Four. (Id. ¶ 4.) Defendants are sued in their official capacity on the ADA/RA claim and otherwise in their individual capacity. (Id. ¶¶ 3-4.) Plaintiff seeks compensatory damages of $100,000 against Agamyan and Granlund "jointly and severally" and $100,000 against "the state government or the governmental agency" on the ADA/RA claim. (Id. at 12.) He seeks punitive damages of $100,000 apiece against Agamyan, Granlund, and the "state government or governmental agency." (Id.)

## STANDARD OF REVIEW

A complaint may be dismissed as a matter of law for failure to state a claim "where there is no cognizable legal theory or an absence of sufficient facts alleged to support a cognizable legal theory." Shroyer v. New Cingular Wireless Servs., Inc., 622 F.3d 1035, 1041 (9th Cir. 2010) (as amended) (citation omitted); accord O'Neal v. Price, 531 F.3d 1146, 1151 (9th Cir. 2008). In considering whether a complaint states a claim, a court must generally accept as true all the factual allegations in it. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); Hamilton v. Brown, 630 F.3d 889, 892-93 (9th Cir. 2011). The court need not accept as true, however, "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." In

---

those theories are not included among the Complaint's articulated "grounds" for relief (see id. at 18-29). The Complaint does not mention the First or 14th amendments anywhere else and fails to allege any facts suggesting that Plaintiff intends to pursue relief on either ground. Plaintiff appears to treat malpractice or negligence as part of his deliberate-indifference claim rather than as a separate cause of action. (See generally id. at 18-25.) If Plaintiff wishes to bring a claim under any of those theories, he may attempt to do so in an amended pleading.

re Gilead Scis. Sec. Litig., 536 F.3d 1049, 1055 (9th Cir. 2008) (citation omitted); see also Shelton v. Chorley, 487 F. App'x 388, 389 (9th Cir. 2012) (finding that district court properly dismissed civil-rights claim when plaintiff's "conclusory allegations" did not support it). Although a complaint need not include detailed factual allegations, it "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Iqbal, 556 U.S. at 678 (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)); Yagman v. Garcetti, 852 F.3d 859, 863 (9th Cir. 2017). A claim is facially plausible when it "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678. "A document filed pro se is 'to be liberally construed,' and 'a pro se complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.'" Erickson v. Pardus, 551 U.S. 89, 94 (2007) (per curiam) (citations omitted); Byrd v. Phx. Police Dep't, 885 F.3d 639, 642 (9th Cir. 2018) (citations omitted).

**DISCUSSION**

**I.   Plaintiff Has Not Stated a Claim Under the ADA or RA**

Plaintiff's second ground for relief is based on purported violations of title II of the ADA and § 504 of the RA. (See Compl. at 25-29.) Title II of the ADA prohibits public entities from discriminating against "qualified" individuals with a disability "by reason of" that disability. See 42 U.S.C. § 12132. To state a claim under title II of the ADA, a plaintiff must allege that (1) he is an "individual with a disability"; (2)

9

he is "otherwise qualified to participate in or receive the benefit of" the defendant public entity's services, programs, or activities; (3) he was "excluded from participation in or denied the benefits" of those services, programs, or activities or "otherwise discriminated against" by the entity; and (4) the exclusion, denial, or discrimination was "by reason of [his] disability." Simmons v. Navajo Cnty., 609 F.3d 1011, 1021 (9th Cir. 2010) (citation omitted). Title II provides for liability against public entities only. See Wilkins-Jones v. Cnty. of Alameda, 859 F. Supp. 2d 1039, 1045, 1048 (N.D. Cal. 2012) (dismissing title II claim against private actor).

Section 504 of the RA prohibits disability discrimination "under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). To state a claim on that theory, a plaintiff must allege that (1) he is an "individual with a disability" who is (2) "'otherwise qualified' to receive the benefit[s]" of the program or activity but was (3) denied such benefits because of his disability, and (4) the program or activity receives federal financial assistance. See Weinreich v. L.A. Cnty. Metro. Transp. Auth., 114 F.3d 976, 978 (9th Cir. 1997) (citations omitted).

The ADA "prohibits discrimination because of disability, not inadequate treatment for disability." Simmons, 609 F.3d at 1022. It "does not create a remedy for medical malpractice." Id. (citation omitted) (no ADA cause of action based on jail's allegedly inadequate treatment for detainee's depression, which resulted in his suicide). There is "no significant difference in analysis of the rights and obligations created by the ADA and the

Rehabilitation Act," and courts have "applied the same analysis to claims brought under both statutes." <u>Zukle v. Regents of the Univ. of Cal.</u>, 166 F.3d 1041, 1045 n.11 (9th Cir. 1999) (student with learning disability failed to make out prima facie case against medical school under either statutory provision).

Plaintiff's ADA/RA claim is based squarely on Defendants' alleged failure to provide adequate treatment for his alleged mental illness after he continued to express suicidal thoughts. (<u>See, e.g.</u>, Compl. at 26-27 (Plaintiff was "exclud[ed]" from the "service, program, or activity" of placement on suicide watch and housing in MHCB).) That claim fails as a matter of law. <u>See Simmons</u>, 609 F.3d at 1022; <u>see also</u> <u>Figueira ex rel. Castillo v. Cnty. of Sutter</u>, No. 2:15-cv-00500-KJM-AC, 2015 WL 6449151, at *8-9 (E.D. Cal. Oct. 23, 2015) (dismissing ADA/RA claims arising from suicide of mentally ill inmate following allegedly inadequate health care in custody; noting that "[t]he defendants cannot have violated the ADA by failing to attend to the medical needs of disabled prisoners").

Should Plaintiff elect to pursue any claim under the ADA or the RA, he must allege facts showing that he is disabled, otherwise qualified to receive a benefit or service, was discriminated against or denied that benefit because of his disability, and that the entity responsible was a public entity (for an ADA claim) or a recipient of federal funds (for an RA claim). <u>See</u> <u>Simmons</u>, 609 F.3d at 1021; <u>Weinreich</u>, 114 F.3d at 978. He may not bring such a claim based solely on medical treatment or lack thereof for his mental illness. <u>Simmons</u>, 609 F.3d at 1022.

11

## II. The Allegations Against the Doe Defendants Do Not Comply with Federal Rule of Civil Procedure 8

Does One through Four are alleged to be mental-health or medical staff members at CSP-LAC "whose names are presently unknow[n] to Plaintiff." (Compl. ¶ 4.) There are no further factual allegations against them. Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." The purpose of the requirement is to "give the defendant fair notice of what the claim is and the grounds upon which it rests." Twombly, 550 U.S. at 555 (citation and alteration omitted). Rule 8(a)(2) "requires a 'showing,' rather than a blanket assertion, of entitlement to relief." See id. at 555 n.3. To comply with Rule 8, a complaint must allege sufficient facts to give fair notice and to enable the other party to defend itself effectively, and it must plausibly suggest entitlement to relief such that it is not unfair to subject the opposing party to the expense of discovery and continued litigation. See Starr v. Baca, 652 F.3d 1202, 1216 (9th Cir. 2011); see also Brazil v. U.S. Dep't of Navy, 66 F.3d 193, 199 (9th Cir. 1995) (Rule 8 requires that complaint provide "minimum threshold" giving defendant "notice of what it is that it allegedly did wrong").

Further, the use of Doe defendants is not favored in the Ninth Circuit. See Wakefield v. Thompson, 177 F.3d 1160, 1163 (9th Cir. 1999) (citation omitted). When the identity of the defendant is not known before the filing of a complaint, however, the plaintiff "should be given an opportunity through discovery

to identify the unknown defendants" unless it is clear discovery would not identify the person or "the complaint would be dismissed on other grounds." Id. (citation omitted).

The Complaint does not allege any specific acts or omissions by any Doe Defendant but does allege two instances of conduct by unidentified people. On April 2, 2017, "custody" staff discovered that Plaintiff was bleeding and took him to receive medical treatment. (See Compl. ¶ 15.) That night, an unnamed correctional officer apparently told nurse Flora that Plaintiff admitted to harming himself in an attempt to avoid transfer. (See id., Ex. B at 74.) None of those people are alleged to have been medical or mental-health practitioners, and they are nowhere identified as Doe Defendants. Plaintiff's claims of deliberate indifference and disability discrimination do not appear to implicate their conduct.

Moreover, Plaintiff's voluminous attached exhibits identify by name numerous medical and mental-health practitioners who interacted with him at relevant times, including nondefendants Ivra, Hammer, Flora, Wu, Amos, Topchyan, and Rastegari, and those same exhibits give no hint that any practitioner's name has been omitted or is unknown or that he intended to sue any of them. (See generally Compl., Exs. A-E.) If he contends that medical or mental-health staff whose names are neither known to him nor contained in his exhibits contributed to his injuries, then in any amended pleading he chooses to file, he must allege specific facts as to what each such unidentified person did and what legal theory he intends to pursue against each of them. See Starr, 652 F.2d at 1216; Wakefield, 177 F.3d at 1163.

13

**III. The Complaint Does Not Comply with Federal Rule of Civil Procedure 10(a)**

Rule 10(a) of the Federal Rules of Civil Procedure requires that "[t]he title of the complaint must name all the parties." The title of the Complaint is <u>Adam Gordy v. Agamyan Ph.D., Granlund, Psy.D., et al.</u> In any amended complaint, Plaintiff must list all the Defendants in the caption or the amended complaint will be subject to dismissal on that basis alone. <u>See</u> <u>Ferdik v. Bonzelet</u>, 963 F.2d 1258, 1260-61 (9th Cir. 1992) (as amended).

**IV. Appointment of Counsel Is Not Warranted**

The Complaint includes a request for appointment of counsel with a declaration in support. (<u>See</u> Compl. at 14-16.) In his declaration, Plaintiff asserts that his case is "complex" because it involves unknown Doe Defendants, "will require discovery of documents and depositions of a number of witnesses," and "involves medical issues that may require expert testimony," and that he cannot litigate it adequately on his own because he is mentally ill and "may not have a high school education." (<u>See</u> Compl. at 15 (Pl.'s Decl.) ¶¶ 2-7.)

There is no constitutional right to appointed counsel in a civil-rights case. <u>See</u> <u>Palmer v. Valdez</u>, 560 F.3d 965, 970 (9th Cir. 2009). Only "exceptional circumstances" support such a discretionary appointment. <u>Id.</u> (citations omitted). Exceptional circumstances exist when there is both a likelihood of success on the merits and a demonstrated inability of the pro se litigant to articulate his claims in light of their legal complexity. <u>Id.</u> (citing <u>Weygandt v. Look</u>, 718 F.2d 952, 954 (9th Cir. 1983) (per

curiam)). A plaintiff requesting appointment of counsel based on his "debilitating mental illness" must submit "substantial evidence" of that mental illness and how it impairs his ability to litigate his case on his own. See Allen v. Calderon, 408 F.3d 1150, 1152-53 (9th Cir. 2005) (holding that court must assess movant's mental health during "relevant time period" and must comply with Fed. R. Civ. P. 17(c) if "substantial evidence" of debilitating mental illness exists).

Plaintiff has demonstrated that he is able to articulate his claims at the pleading stage despite his alleged mental-health and educational challenges, and he has not shown exceptional circumstances. He has not provided "substantial evidence" of the current extent of any mental illness, how long it is expected to last, whether it is adequately controlled with medicine, or how it directly affects his ability to prosecute this action. See Allen, 408 F.3d at 1153.

As discussed above in Section II, he evidently knows the names of all the health-care personnel at CSP-LAC who may be implicated by his allegations. His concerns about the potential complexity of the legal issues appear to relate to discovery or an eventual trial. If any Defendant is eventually served with one of Plaintiff's pleadings and files an answer, the Court may thereafter issue case-management orders allowing discovery to begin or setting a trial date. Plaintiff's motion for appointment of counsel is therefore DENIED without prejudice to the filing of a similar motion at a later stage of the proceedings.

*********************

If Plaintiff desires to pursue his claims, he is ORDERED to file a first amended complaint within 28 days of the date of this order, remedying the deficiencies discussed above. The FAC should bear the docket number assigned to this case, be labeled "First Amended Complaint," and be complete in and of itself, without reference to the original Complaint or any other pleading, attachment, or document. **Plaintiff is warned that if he fails to timely file a sufficient FAC, the Court may dismiss this action on the grounds set forth above or for failure to diligently prosecute.**[10]

DATED: June 22, 2018

JEAN ROSENBLUTH
U.S. MAGISTRATE JUDGE

---

[10] If Plaintiff believes this order erroneously disposes of any of his claims, he may file objections with the district judge within 20 days of the date of the order. See Bastidas v. Chappell, 791 F.3d 1155, 1162 (9th Cir. 2015) ("When a magistrate judge believes she is issuing a nondispositive order, she may warn the litigants that, if they disagree and think the matter dispositive, they have the right to file an objection to that determination with the district judge.").